Utah Legal Services, Inc.
Sheena Knox, # 15457
sknox@utahlegalservices.org
Attorney for Plaintiffs
205 N. 400 W., Salt Lake City, UT 84103
(801) 924-3373

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **CESAR YAPIAS ZEVALLOS,  EFRAIN PEREZ ARIAS, RONNI CAPCHA ALANIA, and DOES 1-10** <br> Plaintiffs <br><br> vs. <br><br> **PETE STAMATAKIS, SHARON STAMATAKIS,  MOUNTAIN PLAINS AGRICULTURAL SERVICE, and DOES 1-10** <br> Defendants | **FIRST AMENDED COMPLAINT** <br><br> **Case No.  2:17-cv-00253-DN** <br><br> **Judge David Nuffer** <br><br><br><br> **JURY TRIAL DEMANDED** |

**PRELIMINARY STATEMENT**

1. Plaintiffs came from Peru to work on a ranch in Utah jointly owned by Defendants Pete Stamatakis and Sharon Stamatakis (Defendants Stamatakis) on visas Defendants procured for them.

2. Defendants did not pay Plaintiffs the wages due to them.  Defendants subjected Plaintiffs to a continuing pattern of physical deprivation and psychological abuse including, but not limited to, insufficient drinking water, insufficient food, deplorable housing, threats of serious bodily harm, and confiscation of legal documents.

3. Plaintiffs worked multiple contract periods for Defendants.  During some of these contracts, Plaintiffs Cesar Yapias Zevallos and Efrain Perez Arias did not work primarily

1

in range sheepherding and instead were required to do the work of ranch hands for the majority of these contract periods.

4. Plaintiffs bring this action to recover damages for injuries inflicted by Defendants under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (FLSA)(Plaintiffs Yapias and Perez), the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1589 et seq. (TVPRA) (all Plaintiffs), and for common law claims under Utah law for breach of contract (all Plaintiffs), intentional infliction of emotional distress (all Plaintiffs), negligent infliction of emotional distress (all Plaintiffs), and quantum meruit (all Plaintiffs).

## JURISDICTION AND VENUE

5. This Court has jurisdiction of this matter pursuant to the following:

   a.  28 U.S.C. § 1331 (federal question);

   b.  28 U.S.C. § 1337 (interstate commerce);

   c.  29 U.S.C. § 216 (b) (FLSA);

   d.  18 U.S.C. § 1595 (TVPRA);

   e.  28 U.S.C. § 1367 (supplemental jurisdiction over Plaintiff's related claims under Utah law).

6. This Court is the proper venue because "a substantial part of the events or omissions giving rise to the claim occurred" in Utah.  28 U.S.C. § 1391 (b) (2).

## PARTIES

7. Plaintiffs Cesar Yapias Zevallos (Plaintiff Yapias), Efrain Perez Arias (Plaintiff Perez), and Ronni Capcha Alania (Plaintiff Capcha) reside in Utah.

8. Defendants Pete and Sharon Stamatakis (Defendants Stamatakis) reside in Utah. Defendant Mountain Plains Agricultural Service (MPAS) is a foreign non-profit organization conducting activities in Utah.

## FACTS

9. Defendants Stamatakis, operate a sheep ranch located in Carbon, Emery, and Millard Counties, Utah.

10. At all times relevant to this complaint, Pete Stamatakis and Sharon Stamatakis were joint owners of the ranch business, which they operated under their own names.  Neither Pete Stamatakis nor Sharon Stamatakis formed any business entity for their ranch business.

11. Defendant, MPAS, is a membership association of sheep ranchers.

12. Defendants Stamatakis, are and were at all times relevant to this complaint, a member of MPAS.

13. The H-2A program enables employers to import foreign workers to come to the U.S. to perform temporary agricultural work.  8 U.S.C. § 1188.  In order to receive H-2A visas, an employer must obtain a certification from the U.S. Department of Labor (DOL) that no U.S. workers are available to perform the jobs and that the wages and working conditions offered to the foreign workers will not adversely affect similarly employed workers in the U.S.  See generally Alfred L. Snapp & Sons, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 594-596 (1982).

14. Regulations found at 20 C.F.R. § 655.122 et seq. govern the contents of the job offers that must be made to both U.S. and temporary foreign workers.

15. In order to obtain an H-2A certification from DOL, an employer must submit an application/job order to DOL.  The regulations require an employer to offer not less than the minimum terms and conditions of work set forth in the regulations including, but not limited to: (a)  housing at no cost to the worker that meets applicable housing standards; (b)  all tools, supplies, and equipment without charge to the worker; (c)  transportation and subsistence expenses to and from the worker's home; (d) written earnings statements each payday; (e) a guarantee of payment of wages for, at minimum, a total number of work hours equal to at least three-fourths of the work period specified in the work contract; (f) return transportation back to the employee's place of origin at no cost to the employee if the employee completes the work contract period.  20 C.F.R. § 655.122; See Exhibit A (2013 Job Order from MPAS and Defendants Stamatakis).

16. These job orders submitted to the DOL incorporate and include by regulation and by operation of law the terms of the H-2A regulations at 20 C.F.R., and in the absence of a separate, written work contract, they constitute employment contracts.  20 C.F.R. § 655.122 (q); See Exhibit A (2013 Job Order from MPAS and Defendants Stamatakis).

17. As a part of the job order for H-2A workers, employers must also attest that they will abide by the assurances in 20 C.F.R. § 655.135 (e), including a promise to comply with applicable federal, state, and local employment-related laws and regulations, such as not holding or confiscating workers' passports, visas, or other immigration documents.

18. In October 2015, the DOL released new regulations for employment of foreign workers for sheepherder positions, 20 C.F.R. § 655.200 et seq.   Prior to the issuance of the regulations, employers seeking foreign workers for sheepherder positions were subject to certain special procedures, 20 C.F.R. § 655.93(b) and (c), set forth in U.S. Dep't of Labor Field Memo 24-01 (Aug. 1, 2001).

19.  Employers who hire H-2A workers to fill sheepherder positions pay a wage lower than that for other agricultural work, though such employers are required to provide food that is free of cost.  20 C.F.R. § 655.210-11 (previously U.S. Dep't of Labor Field Memo 24-01 (Aug. 1, 2001)).  For sheepherders on H-2A visas, the minimum monthly wage for those engaged in the range production of livestock was $750 per month from 2009 – 2015.  Under the new regulations, the rate was $1206.31 per month for 2016.  The minimum hourly wage (Adverse Effect Wage Rate or AEWR) for other agricultural workers on H-2A visas was as follows:  2011: $10.48; 2012: $10.43; 2013: $10.08; 2014: $10.89; 2015: $11.37; 2016: $11.27.

20. Based on information and belief, Defendants Stamatakis and Defendant MPAS filed H-2A visa applications as joint employers each year from 2010-2016 in order to employ temporary foreign workers under the H-2A visa program to work as sheepherders.

21. Employees, such as Plaintiffs, who come to work in the U.S. on H-2A visas are only allowed to work for the employer who filed their H-2A visa application.

22. MPAS plays an integral role in recruiting and initiating H-2A sheepherders' employment with its member ranches.

23. MPAS sets many of the terms of the sheepherders' employment with the member ranch. See e.g., Exhibit A, p. 3 (MPAS Sheepherder Attachment).

24. Defendants Stamatakis and MPAS have unified operations because they organize the filing of job orders and H-2A visas in an organized business system that allows them to recruit and initiate the employment of H-2A workers.

25. MPAS, while a nonprofit, is run for business purposes and has as its mission, "to serve the common business interest of agricultural employers in establishing a continuous . . . source of labor."

26. Defendants Stamatakis and MPAS acted as an enterprise whose annual revenue is above $500,000, and Defendants were subject to the requirements of the FLSA.

27. Plaintiffs used tools, equipment, goods, and/or materials that had been moved in interstate commerce to perform their job duties for Defendants.

28. Defendants employed Plaintiffs and other employees who worked with and cared for livestock and agricultural products which have been moved in and/or produced for interstate commerce, and Plaintiffs Yapias and Perez were entitled to the protections of the FLSA.

29. Defendants entered into employment contracts with each of the Plaintiffs, which stated that (a) Plaintiffs would work attending sheep flock on range or pasture; (b) Defendants would pay Plaintiffs $750 per month for 2011-2015 (later changed by regulations to $1,206.31 per month for 2016); Plaintiffs would be paid twice monthly, unless the employer and employee agreed to a monthly payment arrangement; (c) Plaintiffs would be provided with housing at no cost that would comply with the appropriate housing

standards and regulations; (d)  Plaintiffs would be provided with food at no cost; (e)

Plaintiffs would be provided with all necessary tools and a means of communicating with

persons capable of responding to their needs in case of an emergency at no cost; (f)

Defendants would keep accurate records of the Plaintiffs' earnings and would give

Plaintiffs on or before each payday a statement of earnings.  See e.g., Exhibit A.

30. The representations in these employment contracts were false.  Defendants knew that

these representations were false.  Defendants wrote these promises into the employment

contracts and job orders and communicated these promises, by themselves or through

recruiters, to Plaintiffs with the intent that Plaintiffs would act on these representations by

coming to the U.S. to work.

31. The representations that they would work as sheepherders, be paid regularly, and receive

employer-provided housing, food, and tools while working were material to Plaintiff

Yapias, Plaintiff Perez, and Plaintiff Capcha in their decisions to accept the work

contracts and come to the U.S.  At the time that Plaintiff Yapias, Plaintiff Perez, and

Plaintiff Capcha learned about the terms of the work contracts, they did not know that

these representations were false.  Instead, Plaintiffs rightly relied on the representations

of what the contract would entail when they made their decisions to come to work in the

U.S. for Defendant MPAS and Defendants Stamatakis.

32. Pursuant to an approved visa application, Defendants Stamatakis and Defendant MPAS

contracted with Plaintiff Yapias to begin working on Defendants Stamatakis' ranch

beginning October 2013.  Plaintiff Yapias was put to work there from October 2013

through April 2016.

33. Pursuant to an approved visa application, Defendants Stamatakis and Defendant MPAS contracted with Plaintiff Perez to begin working on Defendants Stamatakis' ranch beginning April 2013.  Plaintiff Perez was put to work there from April 2013 through November 2015 and again from March 2016 until May 2016.

34. Pursuant to an approved visa application, Defendants Stamatakis and Defendant MPAS contracted with Plaintiff Capcha to begin working on Defendants Stamatakis' ranch beginning March 2011.  Plaintiff Capcha was put to work there from March 2011 through December 2012 and again from May 2013 through July 2013.

35. In addition to the initial promises, when Plaintiff Perez was about to return to Peru after his first period of work, Defendant Pete Stamatakis complimented Perez on his good work.  Defendant Pete Stamatakis promised Perez that if Perez returned to work for Defendants again, Defendants Stamatakis would provide Perez with a better trailer, better food, and better pay.

36. At the time Pete Stamatakis made these representations about providing better pay and better working conditions, he knew they were false.

37. When Plaintiff Perez heard Pete Stamatakis finally praise his work, he believed that Pete Stamatakis finally recognized all of his months of hard work.  Pete Stamatakis' words were material to Perez deciding to return to work for Defendants.

38. During the time that Plaintiffs were employed at Defendants Stamatakis' ranch, they worked nine to sixteen hours per day seven days a week, with no vacation days, holidays, or sick days.

39. By regulation, the period of employment for range sheep herding jobs for workers on H-2A visas must be for no more than 364 calendar days.  20 CFR § 655.215 (b) (2).

40. Plaintiff Yapias worked during four different contract periods:  (1) October 2013 – January 31, 2014; (2) February 1, 2014 – January 31, 2015; (3) February 1, 2015 – January 31, 2016; (4) February 1, 2016 – April 2016.

41. During his first, second, and fourth contracts, for more than 50% of the contract period, Plaintiff Yapias was not engaged in range sheepherding.

42. Plaintiff Perez worked during four different contract periods:  (1) April 2013 – January 31, 2014; (2) February 1, 2014 – January 31, 2015; (3) February 1, 2015 – November 2015; (4) March 2016 – May 2016.

43. During his third and fourth contracts, for more than 50% of the contract period, Plaintiff Perez was not engaged in range sheepherding.

44. Plaintiff Capcha worked during three different contract periods:  (1) March 2011 – January 31, 2012; (2) February 1, 2012 – December 2012; (3) May 2013 – July 2013.

45. For weeks and sometimes months at a time, Plaintiffs Yapias and Perez were primarily engaged in non-sheepherding work including cutting trees, training horses, building fences, building chicken coops, feeding and taking care of goats, llamas, cows, and horses, and carrying supplies to other workers and other workers' horses.  Many of these work duties were performed in places where Defendants Stamatakis would frequently, if not daily, supervise Yapias' and Perez's work.  Pete Stamatakis assigned these duties, which during certain weeks and months were Yapias' and Perez's primary work duties, not merely tasks that were incidental to sheepherding.

46. Despite having periods of time when they were not performing work on the range, Plaintiffs did not have a working refrigerator for food storage, a toilet, electric lights, or running water in any of the trailers that they lived in while they worked for Defendants.

47. In 2016, when Yapias and Perez performed non-sheepherding work, Yapias and Perez lived approximately 150 meters behind Defendants Stamatakis' house.  Despite living this close to the ranch headquarters, Plaintiffs Yapias and Perez did not have a shower, an indoor toilet, a toilet connected to a septic tank, or even an outhouse they could use.

48. Plaintiffs were neither paid the federal minimum wage nor the Adverse Effect Wage Rate (AEWR) applicable to agricultural workers on H-2A visas who are performing non-sheepherder work.  Plaintiffs were promised in their contracts that they would work as range sheepherders and receive the monthly sheepherder rate of pay of $750 per month for 2011-2015 and $1,206.31 for 2016.  Plaintiffs were rarely paid, and the wages they did receive were only a fraction of what they had been contractually promised or what they were actually owed for the types of work they performed.

49. In addition to working long hours without adequate rest, Defendants engaged in a continuing pattern of abusive, intimidating, and outrageous behavior towards Plaintiffs throughout the time that Plaintiffs were employed.  Defendants were able to continue this pattern of behavior because of the control Defendants had over Plaintiffs:  control of Plaintiffs' legal documents, control of when and if Plaintiffs were paid, control of where Plaintiffs slept at night, control of what Plaintiffs ate, control of what drinking water Plaintiffs had, and control of Plaintiffs' access to medicine.  Defendants' behavior included acts such as telling Plaintiffs that if they tried to escape they would be put in jail,

ignoring or disputing Plaintiffs' pleas for better quality or quantity of food, water, and heating for their housing, and threatening to kill Plaintiff Perez.

50. Through this pattern of coercion, control, force, and threats of force and serious harm, Defendants were able to obtain Plaintiffs' labor.

51. Defendants' abusive, intimidating, and controlling behavior caused Plaintiffs to suffer emotional distress.

52. Defendants Stamatakis confiscated Plaintiff Yapias', Plaintiff Perez's, and Plaintiff Capcha's passports and visas.

53. When Plaintiffs asked Defendant Pete Stamatakis for their legal documents, Stamatakis would not give them their documents.  Instead, Pete Stamatakis would question them about whether they were going to try to escape, or he would question them about why they would need the documents.  Pete Stamatakis would be angry with and would yell at Plaintiffs when Plaintiffs asked for their legal documents.

54. Defendants Stamatakis held Plaintiff Perez's passport for months at a time.  Plaintiff Perez asked several times for Pete Stamatakis to return his passport, but Pete Stamatakis refused.

55. Defendants Stamatakis held Plaintiff Yapias' passport for more than a year and then, when Yapias asked for his passport, Pete Stamatakis told Plaintiff Yapias' that he had lost Plaintiff Yapias' passport.  Defendant Stamatakis' son drove Plaintiff Yapias to the Peruvian Consulate in Utah to apply for a new passport.  When the passport was ready to be picked up, Yapias did not have a way to travel by himself from Price, Utah to Salt Lake City, Utah to pick up the passport.  Defendant Pete Stamatakis asked Plaintiff

Yapias to sign a document so someone other than Yapias could pick up Yapias' passport. Stamatakis' son picked up Yapias' passport.

56. After Stamatakis' son picked up Plaintiff Yapias' new passport, Defendants Stamatakis continued to confiscate Plaintiff Yapias' passport.  Yapias did not ask Pete Stamatakis for his new passport because of his earlier interactions with Pete Stamatakis.  He feared that Pete Stamatakis would only be angry and tell Yapias that Yapias did not need his passport.

57. Defendants Stamatakis held Plaintiff Capcha's passport for months at a time.  Defendants Stamatakis did not provide Plaintiff Capcha with his visa renewal (I-94).

58. Defendants Stamatakis refused to provide Plaintiff Yapias and Plaintiff Perez with their visa renewals (I-94) when Plaintiffs asked for them.

59. Plaintiff Yapias asked for his I-94 from Pete Stamatakis.  When Pete Stamatakis would not give him his I-94, Plaintiff Yapias called MPAS to ask for his I-94.  MPAS told him that Defendants Stamatakis were supposed to give the I-94 to him.  By referring workers back to Defendants Stamatakis whenever questions or complaints arose, MPAS worked with Defendants Stamatakis to conceal fraudulent promises of authorized work and to confiscate workers' legal documents.

60. Being without their legal documents for extended periods of time and having Defendants refuse their requests for their legal documents caused Plaintiffs stress, worry, and emotional distress.

61. Defendant Pete Stamatakis threatened Plaintiff Perez that if he escaped from working for Defendant Pete Stamatakis, he would go to jail.

62. Plaintiffs spoke and understood very limited English, did not have an understanding of the laws in the U.S., did not have access to a car or public transportation, and often lived in remote, mountainous locations without access to their consulate or other resources.

63. By controlling Plaintiffs' legal documents and threatening Plaintiffs that if they tried to escape they would go to jail, Defendants physically restrained Plaintiffs.

64. Plaintiff Yapias asked a co-worker to report the way they were  treated by Defendants Stamatakis to Defendant MPAS.  The MPAS representative told Yapias' co-worker that in order to complain he had to have an attorney and threatened Plaintiff Yapias' co-worker if his complaint was not successful, he would be sent back to Peru.  By threatening workers when they complained about their work conditions, MPAS worked with Defendants Stamatakis to obtain labor through force and coercion.  Defendants Stamatakis controlled if and when Yapias, Perez, and Capcha received food.  The food Defendants Stamatakis did provide was often expired by up to seven years.  In addition to inadequate quality, there also was inadequate quantity of food for Plaintiffs.

65. Due to Plaintiffs' often remote locations, Defendants Stamatakis controlled if and when Plaintiffs received potable water.  Defendants Stamatakis often did not provide a sufficient quantity of water.  Yapias became so thirsty that he drank out of water where dogs would bathe.

66. There was not water for Plaintiffs to use for cleaning their clothes or for showering or bathing.

67. Defendants Stamatakis ignored and denied Plaintiffs' requests for better quality or larger quantities of food and water.

68. Plaintiffs suffered emotional distress as a result of not having adequate food and water, and as a result of having their requests for help denied.  This physical deprivation also was a form of psychological harm that allowed Defendants to obtain Plaintiffs' labor through force.

69. When Plaintiffs worked on and near the ranch, Defendant Pete Stamatakis controlled Plaintiffs' work schedule and breaks and would often require them to work all day without returning to their trailer to eat.

70. For a few weeks in 2016, Plaintiff Yapias and Plaintiff Perez lived in a trailer with only one bed for the two of them.  Each of the Plaintiffs had the experience of living in a trailer with another co-worker where there was only one bed for two workers.  For the majority of the time Yapias and Capcha worked for Defendants, neither Yapias nor Capcha had his own bed, cot, or mattress.

71. Plaintiffs Yapias, Perez, and Capcha lived in trailers with broken windows.  Yapias also lived in a trailer with a door that would not close properly.  With broken windows and a broken door, these trailers did not provide adequate shelter against the elements, especially during the Utah winters.

72. Perez's, Yapias', and Capcha's primary source of heat for their trailers was wood stoves, and this heating equipment did not supply adequate heat.  Defendants did not provide fire wood as part of the heating equipment.  Plaintiffs searched for dry trees to cut down, but even when they were able to find wood for their stoves, the stoves still did not supply adequate heat to the trailers.

14

73. The housing provided to Plaintiffs Perez, Yapias, and Capcha did not meet the minimum standards required by the DOL.

74. Perez asked for cold medication when he was sick and asked for pain medication when he had a tooth ache.  Stamatakis ignored these requests for medicine.  Due to his remote location at that time and lack of transportation, Perez was unable to obtain these basic medications for himself.

75. Defendant Pete Stamatakis was verbally abusive to Mr. Perez, Mr. Yapias, and Mr. Capcha, yelling at them, calling them names, telling them that their calls for help were unnecessary because they had not died yet, and telling them that they were stupid when they would try to communicate to Pete Stamtakis that they needed drinking water, food, medicine, wood for heat, or visa renewals.  Pete Stamatakis' verbal abuse and refusal to listen to Plaintiffs' concerns caused Plaintiffs' worry and emotional distress.

76. Defendant Pete Stamatakis verbally threatened to kill Perez.  These threats caused Perez severe emotional distress.

77. Defendants did not pay Plaintiffs twice a month as promised in the contract or on any other regular basis.  Instead, Plaintiffs had to repeatedly ask Defendant Pete Stamatakis for money owed to them, and on the few occasions that Defendants Stamatakis did pay Plaintiffs after their requests, Defendants would only pay Plaintiffs a portion of what Plaintiffs were owed.

78. Defendants Stamatakis did not pay Plaintiffs all of the wages contractually due to them for the work they performed.

79. Defendants Stamatakis did not provide Plaintiffs with written statements of their earnings.

80. Defendants' refusal to pay Plaintiffs on a regular basis caused Plaintiffs emotional distress because Plaintiffs had left their homes and families to come to the U.S. based on the promises of regular payment and because Plaintiffs had family members in Peru financially relying on them.

81. Pete Stamatakis told Plaintiffs that he was deducting amounts from their monthly wages for items that were necessary to perform their work, such as flashlights and binoculars to look for sheep and the phones Stamatakis would use to call Plaintiffs on to check on the sheep.  Under their contracts, the employer was required to provide all necessary tools and supplies to perform the work without cost to the employee.  See Exhibit A.

82. Defendants severely, consistently, and materially breached their employment contracts with Plaintiff Yapias, Plaintiff Perez, and Plaintiff Capcha.  Defendants failed to comply with the law, which caused harm to Plaintiffs.  As a result of such breaches and mistreatment, Plaintiff Yapias, Plaintiff Perez, and Plaintiff Capcha feared for their health and safety and were constructively discharged.  See U.S. Dep't of Labor, Wage and Hour Division, Field Assistance Bulletin No. 2012-1, Memorandum from Nancy J. Leppink, https://www.dol.gov/whd/FieldBulletins/fab2012_1.pdf.

83. After working under conditions of physical deprivation and mistreatment, Plaintiff Capcha escaped from the ranch in July 2013.

84. After working under conditions of physical deprivation and mistreatment for more than two years, Plaintiff Yapias escaped from the ranch in April 2016.

85. After Plaintiff Yapias left the ranch, Defendant Pete Stamatakis increased his threats to and harassment of Plaintiff Perez.  On multiple occasions, Pete Stamatakis threatened to kill Perez if Perez did not tell him where Yapias was.  Fearing for his safety, Plaintiff Perez escaped from the ranch in May 2016.

86. Plaintiff Capcha worked with the expectation that he would continue to be able to work legally in the U.S. until January 31, 2014.  In January 2014, his contract would be renewed, or, under the contract, his employer would pay for outbound transportation and subsistence from the work place back to his home (place of recruitment).

87. Plaintiff Yapias and Plaintiff Perez both worked with the expectation that they would continue to be able to work legally in the U.S. until January 29, 2017.  In January 2017, their contracts would be renewed, or, under the contract, their employer would pay for outbound transportation and subsistence from the work place back to their respective homes (places of recruitment).

88. Out of fear for their health and safety, Plaintiffs left the ranch, but then they did not receive transportation back home as promised by contract, they were not able to work for any other employer because they had come to the U.S. on visas obtained for them by Defendants, and they did not have sufficient money because of Defendants' refusal to pay them wages owed to them.  This precarious situation caused Plaintiffs stress and worry.

89. As a result of the conditions and treatment he faced while working for Defendants, Plaintiff Capcha has suffered severe emotional distress including anxiety and worry.

90. As a result of the conditions and treatment he faced while working for Defendants, Plaintiff Yapias has suffered severe emotional distress including excessive anxiety and worry, depressed mood, and nightmares about being back at Stamatakis' ranch.

91. As a result of the conditions and treatment he faced while working for Defendants, Plaintiff Perez has suffered severe emotional distress including stress, anxiety, depressed mood, trouble eating and sleeping, and fear of Pete Stamatakis finding him.


## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Fair Labor Standards Act by Plaintiff Yapias and Plaintiff Perez against Defendants Pete Stamatakis, Sharon Stamatakis, and MPAS)

92. Plaintiffs reallege and incorporate by reference the allegations set forth above.

93. Defendants failed to pay Plaintiffs the required minimum wages for their respective work in violation of 29 U.S.C. § 206, for which they are entitled to relief pursuant to 29 U.S.C. § 216 (b).

94. Plaintiffs bring this civil action to recover damages for wage and other violations no later than ten years after their causes of action arose.  18 U.S.C. § 1595.

95. Defendants' violations of the FLSA were willful, because all Defendants knew or showed reckless disregard as to whether their actions violated the FLSA.  29 USC § 255.

96. As a result, Plaintiffs suffered damages.


### SECOND CLAIM FOR RELIEF
### (Trafficking Victims Protection Reauthorization Act by all Plaintiffs against all Defendants)

97.  Plaintiffs reallege and incorporate by reference the allegations set forth above.

98. Pursuant to 18 U.S.C. §§ 1589 (a), Defendants knowingly obtained the labor of Mr. Yapias, Mr. Perez, and Mr. Capcha by means of:

(a)  force, threats of force;

(b)  serious harm or threats of serious harm;

(c)  abuse or threatened abuse of law or legal process; or

(d)  a scheme, plan, or pattern intended to cause Mr. Yapias, Mr. Perez, and Mr. Capcha to believe that if they did not perform such labor or services, that they would suffer serious harm.

99. Pursuant to 18 U.S.C. § 1589 (b), Defendants, knowingly or in reckless disregard of the facts, participated in a venture that obtained labor or services by means described in prior paragraph, and thereby knowingly benefitted financially or benefitted by receiving something of value.

100.  Pursuant to 18 U.S.C. § 1592, Defendants knowingly removed, confiscated, or possessed Mr. Yapias', Mr. Perez's, and Mr. Capcha's immigration documents:

(a)  In the course of a violation of 18 U.S.C. § 1589

(b)  With the intent to violate 18 U.S.C. § 1589; or

(c)  To prevent or restrict or to attempt to prevent or restrict, without lawful authority Plaintiffs liberty to move or travel, in order to maintain the labor or services of Plaintiffs, when Plaintiffs were the victims of a severe form of trafficking in persons.

101.  As a result, Plaintiffs suffered injuries and are entitled to recover damages pursuant to 18 U.S.C. § 1595.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract by all Plaintiffs against all Defendants))**

102.  Plaintiffs reallege and incorporate by reference the allegations set forth above.

103. Defendants entered into individual employment contracts with Mr. Yapias, Mr. Perez, and Mr. Capcha.

104. The parties also entered into employment contracts each year through the job orders that Defendants submitted to DOL each year.  20 C.F.R. § 655.122 (q); see e.g., Exhibit A.

105. Mr. Yapias, Mr. Perez, and Mr. Capcha each performed all conditions, covenants, and agreements to be performed pursuant to the employment agreement, except where performance was prevented, excused, or rendered impossible by the conduct of Defendants.

106. Defendants breached their employment contracts with Mr. Yapias, Mr. Perez, and Mr. Capcha by failing to comply with the terms and conditions of the contracts, including, but not limited to, failure to pay wages, failure to provide statements of earnings, failure to provide housing that complied with federal regulations, failure to provide sufficient meals, and failure to provide a sufficient amount of potable water.

107. As a direct and proximate result of Defendants' breach, Mr. Yapias has been injured and is entitled to relief in an amount totaling at least $75,126.30.

108. As a direct and proximate result of Defendants' breach, Mr. Perez has been injured and is entitled to relief in an amount totaling at least $54,215.13.

109. As a direct and proximate result of Defendants' breach, Mr. Capcha has been injured and is entitled to relief in an amount totaling at least $18,709.68.

**FOURTH CLAIM FOR RELIEF**
**(Quantum Meruit by all Plaintiffs against all Defendants))**

110. Plaintiffs reallege and incorporate by reference the allegations set forth above.

111. Plaintiffs Yapias, Plaintiff Perez, and Plaintiff Capcha performed valuable services for

the Defendants.  The Defedants directed Plaintiffs to perform those services, accepted the

benefit of those services, and knew that Plaintiffs expected compensation for those

services.

112. As a result, Plaintiffs suffered damages.

113. Plaintiffs are entitled to compensation in quantum meruit at the lawful minimum wage

applicable to those services, in the year in which those services were performed,

$10.48 per hour for work performed in 2011

$10.43 per hour for work performed in 2012

$10.08 per hour for work performed in 2013

$10.89 per hour for work performed in 2014

$11.37 per hour for work performed in 2015

$11.27 per hour for work performed in 2016.

**FIFTH CLAIM FOR RELIEF**
**(Intentional Infliction of Emotional Distress by all Plaintiffs against all Defendants))**

114.  Plaintiffs reallege and incorporate by reference the allegations set forth above.

115. Defendants engaged in outrageous conduct towards Plaintiff Yapias, Plaintiff Perez, and

Plaintiff Capcha with the intent to cause or with reckless disregard for the probability of

21

causing severe emotional distress.  To the extent that said outrageous conduct was perpetrated by certain Defendants, the remaining Defendants adopted and ratified said conduct with a wanton and reckless disregard of the deleterious consequences to Plaintiff Yapias, Plaintiff Perez, and Plaintiff Capcha.

116. Defendants committed the acts alleged herein for the purpose of inflicting emotional distress, or in a manner that a reasonable person would have known that emotional distress would result.

117. Defendants committed the acts alleged herein in a willful and malicious manner with a knowing and reckless indifference towards the rights of the Plaintiffs, entitling them to recover punitive damages in amounts to be proven at trial.

118. As a proximate result of said wrong actions or omissions, Plaintiff Yapias, Plaintiff Perez, and Plaintiff Capcha have suffered and continue to suffer severe and extreme emotional distress, in amounts to be proven at trial.


**SIXTH CLAIM FOR RELIEF**
**(Negligent Infliction of Emotional Distress by all Plaintiffs against all Defendants))**

119.  Plaintiffs reallege and incorporate by reference the allegations set forth above.

120. Defendants engaged in outrageous conduct that unintentionally caused emotional distress to Plaintiffs.

121. Defendants should have realized that such conduct involved an unreasonable risk of causing emotional distress.

122. Defendants should have realized from the facts they did know, that if they caused emotional distress, it might result in illness or bodily harm.

123. As a result of Defendants actions, Plaintiffs suffered damages.

## PRAYER FOR RELIEF

124.  Plaintiffs respectfully request that this Court enter an order:

a.    Accepting jurisdiction of this case;

b.   Declaring that Defendants violated TVPRA and awarding damages in an amount to be proven at trial and reasonable attorney's fees to Plaintiffs;

c.   Declaring that Defendants violated FLSA and awarding unpaid minimum wages, statutory liquidated damages, costs, and reasonable attorney's fees to Plaintiffs Yapias and Perez;

d.   Declaring that Defendants breached their employment contracts with Plaintiffs, and awarding damages to Plaintiffs as a result of those breaches.

e.   Entering judgment against Defendants on Plaintiffs' quantum meruit claim and awarding Plaintiffs damages in quantum meruit;

f.   Awarding compensatory damages, including emotional distress, according to proof;

g.   Awarding punitive damages according to proof;

h.   Awarding Plaintiffs costs;

i.   Awarding Plaintiffs reasonable attorney's fees;

j.   Awarding Plaintiffs prejudgment and post-judgment interest; and

k.   Granting such other relief as this Court deems just and proper.

Dated this 3rd day of April, 2017

Respectfully submitted,
UTAH LEGAL SERVICES, INC.

/s/ Sheena J. Knox_____
Sheena J. Knox
Attorney for Plaintiffs

# EXHIBIT A

U.S. Department Labor
**Employment and Training Administration**

OMB Control No. 1205-0134
**Expiration Date:** November 30, 2012

**Agricultural and Food Processing Clearance Order ETA Form 790**
**Pedido de Empleados para Agricultura y Procesamiento de Alimentos**

| | |
|---|---|
| 1. Employer's Name and Address (Number, Street, City, State, and Zip Code)<br>Nombre y Dirección del Empleador (Número, Calle, Ciudad, Estado y Código Postal)<br><br>Pete Stamatakis<br>**1111 South 450 West, Price, UT 84501 (Physical Address)**<br>**1111 South 450 West, Price, UT 84501 (Mailing Address)**<br>Telephone:  (435) 637-5383<br><br>**EMPLOYER AGENT: MOUNTAIN PLAINS AGRICULTURAL SERVICE**<br>811 North Glenn Road, Casper, WY 82601 (Physical Address)<br>PO Box 3777, Casper, WY 82602 (Mailing Address)  Email: kelli@mpaswy.com<br>Telephone number/Teléfono: (307)472-2105  Fax: (307) 235-1075 | **Nos. 4-8 for STATE USE ONLY**<br>**Números 4 a 8 para USO ESTATAL** |

| 4. Industry Code /Código Industrial | 5.Job Order No. /Mum. de Orden de Emp |
|---|---|
| 6. Occupational Title and Code /Título Ocupacional y Código | |
| 7. Clearance Order Issue Date / Fecha de Tramite: | |

| 2. Location and Direction to Work Site / Dirección del lugar de trabajo<br><br>**1111 South 450 West Price UT 84501 AND various range locations in Carbon, Emery & Millard Counties UT.**<br><br>(If additional space is needed, use separate sheet of paper) | 8. Job Order Expiration Date / Fecha de vencimiento: |
|---|---|
| | 9. Anticipated Period of Employment / Periodo Anticipado de Empleo<br><br>From/Desde:  **02/01/2013**   To/Hasta:  **01/31/2014** |

| 3. Location and Description of Housing / Dirección y Descripción de la Vivienda<br><br>**5 mobile units to house workers at 1111 South 450 West Price UT 84501 AND various range locations in Carbon, Emery & Millard Counties UT.**<br><br>If additional space is needed, use separate sheet of paper(Si necesita mas espacio, utilice documento adicional ) | 10. No. of Worker's Requested/Num. de Trabajadores Solicitados   6 |
|---|---|

11. Anticipated Hours of Work per Week    Total:

Horas Anticipadas de Trabajo por Semana   **On Call 24/7**

| | |
|---|---|
| Sunday/Domingo _____ | Wednesday/Miercoles _____ |
| Monday/Lunes _____ | Thursday/Jueves _____ |
| Tuesday/Martes _____ | Friday/Viernes _____ |
| | Saturday/Sabado _____ |

| 12. Collect Calls Accepted/Se Aceptan Llamadas a Cobrar: | |
|---|---|
| Employer / El Empleador    Yes [X]  No  ☐ | **Agent's Toll Free #** |
| Local Office/Oficina Local   Yes ☐  No  [X] | **1-800-349-6439** |

13 . Board Arrangements / Arreglo de Alojamiento
The employer will provide, at no cost to the worker, provisions, utensils, utilities and facilities for using in preparing their own meals.  During certain seasons of the year, the employer may at the employer's option, provide the worker with prepared meals, at no cost to the workers. //////////////  El empleador proveería provisiones, utensilios, utilidades y facilidades, sin costo al trabajador, para uso del trabajador en preparacion de su propia comida.  Durante ciertas temporadas del ano el empleador, puede, segun su propia opcion, proveer comidas ya preparadas para los trabajadores, que seran sin costo al trabajador.

(see attachment / para mas detalles vea  **A** )

14. Referral Instructions / Instruciones para el Referimiento de Candidatos
Interested applicants and the State Workforce Agency may call between 8:00 AM and 5:00 PM, Mon. thru Fri. (MST) (closed noon hour).  Applicants who call Mountain Plains Agricultural Service (MPAS) directly to apply for a job may do so immediately or visit the local State Workforce Agency  to submit their application and be advised of the terms, conditions and qualifications for the job, pursuant to 20 CFR 655.155.  Applicants applying directly with MPAS will be provided an application by the most expeditious means and instructed to complete and return the application. MPAS staff will interview and screen applicants who submit their applications and who are referred by the local State Workforce Agency.  MPAS will also check applicant references on behalf of the employer. MPAS HAS A TOLL FREE TELEPHONE NUMBER: 1-800-349-6439 TO ALLOW EMPLOYMENT SERVICE STAFF TO REFER APPLICANTS WHO ARE AT THEIR DESK OR TO PROVIDE TO APPLICANTS AFTER APPRISAL OF JOB DESCRIPTION AND TERMS AND CONDITIONS OF EMPLOYMENT. A MINIMUM OF SIX MONTHS EXPERIENCE HERDING SHEEP OR SIMILAR TENDING OF RANGE LIVESTOCK IS REQUIRED.  Applicants must provide the name, address and telephone number of the previous employer being used as a reference (the reference must be able to verify the worker's experience in the occupation for which the worker is applying).  When an applicant has not worked as sheepherder during the past twelve (12) months, up to two (2) references will be required.

15. Job Specifications/Descripción de Trabajo
Attends sheep flock grazing on range or pasture.Herds flock and rounds up strays using trained dogs. Beds down flock near evening campsite. Guards flock from predatory animals and from eating poisonous plants. Drenches sheep. May examine animals for signs of illness and administer vaccines, medications and insecticides according to instruction. May assist in lambing, docking, and shearing. May perform other farm or ranch chores related to the production and husbandry of sheep on an incidental basis.  The size of range flocks generally range from 800-1000 sheep.  May attend sheep and lambs in barns during lambing season.  May brand, tag, clip or otherwise mark sheep for identification purposes.  May sort and cut culls.  May feed animals supplementary rations.

Atiende al rebano de borregas en el pastoreo o en campo abierto; mueve a las borregas de y hacia una área designada para el pastoreo; previene que los animales se separen del rebano y se pierdan, usando perros entrenados para mantenerlos juntos y moverlos a otras áreas. Prepara una cerca/selecciona un lugar seguro cerca del campamento para que el rebano duerma en la noche. Protege  al rebano de animales depredadores y previene que coman plantas venenosas. El tamaño del rebano generalmente es de 800 a 1000 borregas. Asiste con parto, corte de colas, castración, trasquila, vacunación, aplica medicamento a animales. Atiende a las borregas y a sus crías en el cobertizo en temporada de parto. Marca a los animales para identificarlos. Organiza y corta animales sacrificados. Provee a los animales con alimento suplementario.

(see attachment/para má detalles vea  A)

16. Wage Rates, Special Pay Information and Deductions / Tarifa de Pago, Información Sobre Pagos Especiales y Deducciones (Rebajas)

| Crop Activiites / Cultivos | Hourly Wage / Salario por Hora | Piece Rate / Unit(s) / Pago por Pieza / Unidad(es) | Special Pay (bonus, etc) / Pagos Especiales (Bono etc.) | Deductions / Deducciones | Yes/Si | NO | Pay Period / Periodo de Pago |
|---|---|---|---|---|---|---|---|
| Sheepherder | $ N/A | $ N/A | $ N/A | Social Security/ Seguro Social | X | | Weekly/Semmanal |
| $ N/A | $ N/A | $ N/A | $ N/A | Federal Tax/ Impuestos Federales | X | | |
| $ N/A | $ N/A | $ N/A | $ N/A | State Tax/ Impuestos Estatales | X | | Bi-weekly /cada 2 sem. |
| | $ | $ | | Meals/ omidas/ | | X | |
| | $ | $ | | Other (specify)/ Otro | See ATT. A | | $750 monthly + Room & Board |

More Details About thePay/Más Detalles Sobre el Pago

**Social Security/Medicare taxes and Federal/State Income Taxes will be withheld from wages of U.S. Workers.**

*If additional space is needed, use separate sheet of paper. / Si necesita más espacio, utilice documento adicional.)* (see attachment / para más detalles vea **A**)

17. Transportation Arrangements / Arreglos de Transportación  (Please explain) **Employer will provide advance inbound & outbound transportation on most economical common carrier or other transportation conforming w/Interstate Commerce Commission (ICC)).**

*If additional space is needed, use separate sheet of paper. / Si necesita más espacio, utilice documento adicional.)* (see attachment / para más detalles vea **A**)

18. Is it the prevailing practice to use Farm Labor Contractors (FLC) to recruit, supervise, transport, house, or pay workers for this (these) crop activity(ies)? Es la costumbre en el area de usar Contratistas Agicolas para reclutar, supervisar, transportar, dar vivienda, ó pagarle a los trabajadores en este/estos tipo(s) de cosecha(s)/sembrado(s)? Yes/Si ☐ No ■

If you have checked yes, what is the FLC  wage for each activity?/Si contesto "Si," cual es el salario que le paga al Contratista Agrícola para cada actividad?   **N/A**

| | | | |
|---|---|---|---|
| 19. Unemployment Insurance provided / Seguro por Desempleo: | Yes ☐ | | No ■ |
| 20. Workers' compensation insurance provided / Indemnización por accidente de trabajo: | Yes ■ | | No ☐ |
| 21. Are tools provided at no charge to the workers? / ¿Se le proveen las herramientas de trabajo a los trabajadores sin cargo alguno? | Yes ■ | | No ☐ |

22. List any arrangements which have been made with establishment owners or agents for the payment of a commission or other benefits for sales made to workers.  (If there are no such arrangements, enter "None")/ Indique todo acuerdo o convenio con los propietarios del establecimiento o sus representantes con respecto al pago de una comisión u otros beneficios por ventas hechas a los trabajadores. (Si no hay ningún acuerdo o convenio, indique "Ninguno") **NONE**

23. List any strike, work stoppage, slowdown, or interruption of operation by the employees at the place where the workers will be employed.  (If there are no such incidents, enter "None")/ Enumere todo huelga, paro o interrupción de las operaciones por parte de los empleados en el lugar de empleo. (Si no hay, indique "Ninguno") **NONE**

| 24. Address of Order Holding Office (include Telephone number)/Dirección de la Oficina donde se Radicó la Oferta (incluya número de teléfono) | 25. Name of Local Office Representative (include direct dial telephone number) / Nombre del Representante de la Oficina Local (Incluya numero de telefono) |
|---|---|
| **140 East 300 South, 4th Floor, Salt Lake City UT  84111 Tel: (801)526-4369** | **Melissa McKean, Tel:(801)526-4369** |

26. Employer's Certification: This job order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job. Certificacion del Empleador: Esta orden de trabajo describe los términos y condiciones de trabajo y contiene todos los materials, terminus, y condiciones ofrecidos.
Employer's Signature & Title/ Firma y Título del Empleadors

*(signature)*

**Signed by Executive Director, Kelli M. Griffith for members of Mountain Plains Agricultural Service**
**(see Designation of Agent Form signed by employer)**

**READ CAREFULLY**: In view of the statutorily established basic function of the Employment Service as a no-fee labor exchange, that is, as a forum for bringing together employers and job seekers, neither the ETA nor the State agencies are guarantors of the accuracy or truthfullness of information contained on job orders submitted by employers. Nor does any job order accepted or recruited upon by the One-Stop Career Center constitute a contractual job offer to which the One-Stop Career Center, ETA or a State agency is in any way a party.
LEASE CUIDADOSAMENTE: En vista de su función básica establecida estatutariamente el Servicio de Empleo es un  intercambio gratis de trabajo para juntar a los empleadores y trabajadores que buscan empleo, ni ETA ni las agencias del estado pueden garantizar la verdad y certeza de la información contenida en la Orden de Trabajo sometida por el Empleador. Tampoco, ninguna orden de trabajo aceptada o reclutada por el Servicio de Empleos constituye una oferta contractual de la cual ETA ni la agencia del Estado son parte

**Public Burden Statement**
Public reporting burden for the ETA Form 790 is estimated to be approximately 60 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and reviewing the collection.  Respondents obligation to reply to these requerments is obligatory by 20 CFR 653.500 and 44 U.S.C. 3501. .  Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.  Public reporting burden for this collection is estimated to average 8 minutes per response, including the time to review instructions, search existing data sources, gather  and  maintain the data needed, and complete and review the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection including suggestions for reducing this burden  to the U.S. Department of Labor, Migrant and seasonal Farmworker Program, Room S4209, 200 Constitution Avenue, NW. Washington, DC 20210.

ETA Form 790 (Revised Oct, 2010)

# Mountain Plains Agricultural Service

PO Box 3777, Casper, WY 82602, (811 N. Glenn Rd. 82601); Telephone (307)472-2105, FAX (307) 235-1075

## SHEEPHERDER – ATTACHMENT 'A' TO ETA-790
### (AL, AZ, CO, ID, MT, ND, SD, UT, WA & WY)

**Job duties, qualifications and requirements:** Employees will be required to: attend sheep flock grazing on the range or pasture, herd flock and round up strays using trained dogs, bed down flock near evening campsite, guard flock from predatory animals and from eating poisonous plants, drench sheep. It is mandatory that workers are on call for up to 24 hours per day, 7 days per week. Additional duties may be: examine animals for signs of illness and administer vaccines, medications and insecticides according to instructions, assist in lambing, docking, and shearing, perform other farm or ranch chores related to the production and husbandry of sheep on an incidental basis.

CONDITIONS AND QUALIFICATIONS FOR EMPLOYMENT: Must be able to ride and handle horses in a manner to assure the safety of the worker, co-workers, and livestock. Employee must be willing to: perform tasks capably and efficiently without close supervision, and live and work singly or in small groups of workers in isolated areas for extended periods of time. The job may entail working with and around farm machinery such as tractors for feeding purposes and ATVs for movement of sheep, periodically. Employee will work outdoors in all types of weather and may experience occasional exposure to herding hazards such as poisonous snakes and predators.

A MINIMUM OF SIX (6) MONTHS EXPERIENCE HERDING SHEEP OR SIMILAR TENDING OF RANGE LIVESTOCK IS REQUIRED. Applicants must provide the name, address and telephone number of the previous employer being used as a reference (the reference must be able to verify the worker's experience in the occupation for which the worker is applying). When an applicant has not worked as sheepherder during the past twelve (12) months, up to two (2) references will be required.

**Housing:** Workers are required to live on the ranch or on the range. Sufficient housing will be provided at no cost to H-2A workers and any workers in corresponding employment who are not reasonably able to return to their residence within the same day. Except for long-established standards for mobile housing as set out in Attachment B, all employer-provided housing must comply with requirements set out in 20 CFR 655.122(d) for the entire period of occupancy. An employer whose itinerary requires mobile housing may provide mobile housing to its workers. On ranches with more than one approved housing site, the workers will be required to live at any approved housing site, and to move from site to site as the work requires. However, no housing will be occupied at any time by more workers than approved capacity for such housing, unless a variance has been approved by the State Workforce Agency.

Housing will be clean and in compliance with applicable standards when occupied. Worker/s will be responsible for maintaining housing in a neat, clean manner. Reasonable costs for repair of damages, other than that which is caused by normal wear and tear, may be charged to workers found to be responsible for damage to housing and furnishings.

**Workers' compensation:** The employer will provide, at no cost to the worker/s, Workers' Compensation coverage or private insurance which is equal to Workers' Compensation laws for comparable employment, in each state where work will be performed.

**Employer-provided items (at no cost to the worker):** All tools and equipment necessary to perform the duties assigned as well as transportation between worker's on-site housing and the work site. Workers will have an effective means of communicating with persons capable of responding to the worker's needs in case of an emergency.

**Meals:** The employer will provide, at no cost to the worker, provisions, utensils, utilities and facilities for using in preparing their own meals. During certain seasons of the year, the employer may opt to provide the worker with prepared meals, at no cost to the workers.

**Transportation and Daily subsistence:** The employer will provide advance inbound transportation (most economical common carrier or other transportation which conforms to the Interstate Commerce Commission (ICC)). The employer will also provide advance subsistence at a minimum amount of **$11.13** per 24-hour period of travel from the place of recruitment to the place of employment. Workers who provide receipts for meals and non-alcoholic beverages in excess of **$11.13** will be reimbursed during the first pay period, up to the maximum amount of **$46.00 per** 24-hour period of travel (12:01 A.M.-12:00 midnight) from the place of recruitment to the place of employment. Transportation and subsistence which was advanced to the worker will be deducted from the worker's pay, but will be reimbursed to the worker upon 50% completion of the work contract. Workers who voluntarily quit or are terminated for cause prior to completing 50% of the contract period will be required to reimburse the employer for the full amounts of transportation and subsistence which were advanced and/or reimbursed to the worker.

In the event of termination for contract impossibility, employer will reimburse the worker the full amount of any deductions made from the workers pay by the employer for transportation and subsistence expenses to the place of employment; and pay the worker for any costs incurred by the worker for transportation and daily subsistence to that employer's place of employment.

Upon completion of the work contract, or termination for contract impossibility (including due to Act of God or medical reasons), the employer will provide or pay outbound transportation (under the most economical common carrier or other transportation which conforms to ICC regulations) and subsistence from the work site to the place of recruitment. The amounts the employer will pay outbound subsistence will be the minimum amount of **$11.13 per** 24-hour period of travel. The maximum amount reimbursed not to exceed **$46.00** per 24-hour period of travel (12:01-12:00 midnight) for workers who provide receipts. This requirement will be nullified if the worker has contracted with a subsequent H-2A employer who has agreed to pay for the worker's transportation and subsistence costs from the present employer's work site.

Written notification to the NPC, and DHS in case of H-2A workers, or any other method specified by the Department or DHS in a notice published in the **Federal Register,** will relieve the employer of the responsibility of providing outbound (return to place of recruitment) transportation and subsistence expenses to workers who voluntarily abandon employment before the end of the contract period, or who are terminated for cause. (CFR 655.122 (n)

**Wage Rates, Earnings records and Statements:** Employer will pay the highest prevailing wage established by the OFLC Administrator for work performed in each state listed in an approved itinerary.

The employer will maintain accurate and adequate records with respect to the workers' earnings and furnish the worker on or before each payday a statement of earnings. Each statement of earnings will include, but not be limited to: total earnings per pay period, monthly rate of pay, itemizations of all deduction, the beginning and ending dates of pay period, the worker's name and address, and the employer's name, address and FEIN. (20 CFR 655.122(k)

Earnings records, kept at a safe and accessible place, will include but not be limited to: summary payroll records, nature and amount of work performed, earnings per pay period, they workers' home address, and the amount and reasons for ALL deductions made to workers wages. NOTE: Unique circumstances of employing sheepherders exempt employers from recording hours actually worked and beginning and ending times of each workday.

All records shall be available for inspection and transcription by the Secretary or a duly authorized and designated representative, and by the worker and representatives designated by the worker as evidenced by appropriate documentation (an Entry of Appearance as Attorney or Representative, Form G– 28, signed by the worker, or an affidavit signed by the worker confirming such representation). Where the records are maintained at a central recordkeeping office, other than in the place or places of employment, such records must be made available for inspection and copying within 72 hours following notice from the Secretary, or a duly authorized and designated representative, and by the worker and designated representatives as described in this paragraph. CFR 655.122(j)(1)(2)

The employer shall retain payroll records for not less than three (3) years after the date of certification. CFR 655.122(j) (4)

**Frequency of pay:** Workers will be paid twice monthly in accordance with the frequency of pay requirement, unless the employer/employee mutually agree to a monthly payment arrangement (Special Procedures , Labor Certification Process for Sheepherders and Goatherders Under the H-2A Program),   Employer will make the following deductions:  FICA (If applicable); loans and advances (if any): long-distance telephone charges (if any); the reasonable repair or replacement cost of willful or negligent damage to housing, tools and equipment caused by the worker (other than normal wear and tear).

**Period of Employment and Work Contract:** The employer guarantees to offer the worker employment for a total number of work days equal to at least three-fourths of the workdays of the total period beginning with the first workday after the arrival of the worker at the place of employment or the advertised contractual first date of need, whichever is later, and ending on the expiration date specified in the work contract or in its extensions, if any (CFR 655.122 (i) (1).

If, before the expiration date specified in the work contract, the services of the worker are no longer required for reasons beyond the control of the employer due to fire, weather, or other Act of God that makes the fulfillment of the contract impossible, the employer may terminate the work contract. Whether such an event constitutes a contract impossibility will be determined by the CO. In the event of such termination of a contract, the employer must fulfill a three-fourths guarantee for the time that has elapsed from the start of the work contract to the time of its termination. The employer will make efforts to transfer the worker to other comparable employment acceptable to the worker, consistent with existing immigration law, as applicable.  20 CFR 655.122(o)

The employer will provide to qualified and eligible workers referred through the clearance system 40+ hours of work for the week beginning with the anticipated date of need specified in Item 9 and will pay the corresponding wage of **$173.21** for that first week of work unless the employer has amended the date of need at least 10 working days prior to the original date of need by notifying the order-holding office.  This guarantee can only be abated for reasons of Act of God, abandonment of employment, or termination for cause.

The employer shall provide to an H–2A worker no later than the time at which the worker applies for the visa, or to a worker in corresponding employment no later than on the day work commences, a copy of the work contract, between the employer and the worker in a language understood by the worker as necessary or reasonable. For an H–2A worker going from an H–2A employer to a subsequent H–2A employer, the copy shall be provided no later than the time an offer of employment is made by the subsequent H–2A employer .(CFR 655.122 (q)   Since the ETA-790 and Attachment A includes all of the minimum benefits, wages and working conditions listed in CFR 655.122 (d) through (q) it will serve as the work contract for workers employed by Mountain Plains Agricultural Service members.

**Terminations:** A worker may be terminated for just cause under conditions specified in CFR 655.122 (n) and CFR 655.122 (o).   Offenses considered just cause for termination of employment include, but are not limited to the following:

    (a)   Failure to report to work, excessive absences from work, or leaving the work site without approval;

    (b)   Failure to perform work of reasonable quality and quantity with reasonable diligence.  Some examples are: allowing sheep to graze in unauthorized areas; inability to ride and handle horses and use trained dogs; or failure to move flock according to designated timetables;

    (c)   Gross negligence or deliberate actions which result in inferior work; waste, damage or injury to employer's property or livestock.  Some examples are: sleeping on the job; abusing horses or other livestock; refusing to carry out good faith, reasonable orders; being under the influence of  alcohol or drugs; horseplay;

    (d)   Deliberate damage or injury to another worker or his possessions;

    (e)   Stealing company, ranch, employer or co-worker's property;

    (f)   Possession of firearms other weapons without employer authorization; or

    (g)   Changing application, or lying on employment application with regard to work experience.

The employer will apply these standards uniformly and in a non-discriminatory manner, as required by law.

Termination may be carried out by the employer, and/or the employer's agent, but only after two written warnings (not necessarily for the same offense).  The warnings will be written in a language understandable to the worker, and the

worker be given an opportunity to sign the warning.  Termination may be carried out without first having issued any warning, if the employee's offense is of a severe or emergency nature such as a threat to the life, safety and /or health of the worker, livestock or others; or, is the intentional destruction of property.  If an employee is involuntarily terminated, the worker will be provided a written statement explaining the cause/s for termination.

If the worker voluntarily abandons employment before the end of the contract period, or is terminated for cause, and the employer notifies the NPC, and DHS in the case of an H–2A worker, in writing or by any other method specified by the Department or DHS in a manner specified in a notice published in the **Federal Register** not later than 2 working days after such abandonment occurs, the employer will not be responsible for providing or paying for the subsequent transportation and subsistence expenses of that worker under this section, and that worker is not entitled to the three-fourths guarantee. Abandonment will be deemed to begin after a worker fails to report for work at the regularly scheduled time for 5 consecutive working days without the consent of the employer. CFR 655.122 (n)

**ASSURANCES/OBLIGATIONS:** The employer agrees to abide by assurances at 20 CFR 655.135 and 20 CFR 653.501.

**Referral Instructions:** Interested applicants and the State Workforce Agency may call between 8:00 AM and 5:00 PM, Mon. thru Fri. (MST) (closed noon hour).  Applicants who call Mountain Plains Agricultural Service (MPAS) directly to apply for a job may do so immediately or visit the local State Workforce Agency  to submit their application and be advised of the terms, conditions and qualifications for the job, pursuant to 20 CFR 655.155.  Applicants applying directly with MPAS will be provided an application by the most expeditious means and instructed to complete and return the application. MPAS staff will interview and screen applicants who submit their applications and who are referred by the local Workforce Agency.  MPAS will also check applicant references on behalf of the employer. MPAS HAS A TOLL FREE TELEPHONE NUMBER: 1-800-349-6439 TO ALLOW EMPLOYMENT SERVICE STAFF TO REFER APPLICANTS WHO ARE AT THEIR DESK OR TO PROVIDE TO APPLICANTS AFTER APPRISAL OF JOB DESCRIPTION AND TERMS AND CONDITIONS OF EMPLOYMENT

If hired, the applicant must be able to provide U.S. employment eligibility and/or identification documents in verification of the applicant's right to work in the United States.  The worker will be afforded the time allotted by law to produce the proper documentation as outlined on the I-9 Form.  The employer or agent for the employer will complete the EMPLOYMENT ELIGIBILITY VERIFICATION FROM (FORM I-9) on each worker.

# Mountain Plains Agricultural Service

PO Box 3777, Casper, WY  82602, (811 N. Glenn Rd. 82601); Telephone (307)472/2105, FAX (307) 235-1075

### REQUEST FOR CONDITIONAL ACCESS
### INTERSTATE CLEARANCE SYSTEM

<u>Pete Stamatakis</u>                                    , request permission for conditional entry into the ES Interstate
Clearance System. This request is to facilitate  my job order being transmitted to labor supply states in a timely
manner to assist the recruitment of domestic workers.

As a condition for placing my order into interstate clearance, I  assure that my housing will meet such standards
as are agreed upon to fulfill the requirements of the U. S. Secretary of Labor for the use of the Employment Service
Facilities for interstate clearance of orders.

I also authorize representative of the State Employment Service, the State Health Department, and/or the U.S.
Employment and Training Administration to inspect the housing that I am offering such workers at any reasonable
time to verify its condition.

I expect my housing to be occupied by   <u>02/01/2013</u>

Based upon the above date, my housing will meet applicable standards by   <u>01/01/2013</u>


_____          _____
Signature of employer                                              Date


_____          _____
Employment Service Representative                    Date


11/19/2012